# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

SARA M. SANGEL,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C10-4070-PAZ

**MEMORANDUM OPINION AND ORDER**

---

### *Introduction*

      This matter is before the court for judicial review of a decision by an administrative law judge ("ALJ") denying the plaintiff's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* The plaintiff Sara M. Sangel claims substantial evidence on the record as a whole fails to support the ALJ's decision that she is not disabled.

      Sangel filed her application on November 21, 2005, alleging a disability onset date of March 15, 2001.[1] Her claim was denied initially and on reconsideration. She filed a request for hearing, and a hearing was held on November 16, 2007, before an ALJ. Sangel was represented by an attorney at the hearing. Sangel's mother and husband testified at the hearing, and Sangel testified on her own behalf. A vocational expert ("VE") also testified. On December 12, 2007, the ALJ issued his decision, finding that although Sangel has several severe impairments, her impairments do not, singly or in combination, reach the Listing level of severity. The ALJ found Sangel is able to perform light work, and she is able to return to her past relevant work as a production line solderer.

---

[1]Sangel filed prior applications in 2001 and 2005, both of which were denied without proceeding to a hearing.

He therefore concluded Sangel is not disabled. On May 26, 2010, the Appeals Council issued its decision denying Sangel's request for review, making the ALJ's decision the final decision of the Commissioner.

Sangel filed a timely Complaint in this court, seeking judicial review of the ALJ's decision. On September 8, 2010, with the parties' consent, Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. The parties have briefed the issues, and the matter is now fully submitted and ready for review.

The court must decide whether the ALJ applied the correct legal standards, and whether his factual findings are supported by substantial evidence based on a review of the record as a whole. 42 U.S.C. § 405(g); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). In this deferential review, the court will consider the record in its entirety to determine whether a reasonable mind would find the evidence adequate to support the Commissioner's conclusion. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citations omitted); *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006). The court first will summarize the testimony at the ALJ hearing, and the other evidence in the Record.

## Hearing Testimony

Sangel was thirty-one years old at the time of the hearing. She and her husband live in Milford, Iowa. She is 5'7" tall and, at the time of the hearing, weighed about 280 pounds. She stated she has had weight problems all of her life. She does not believe her weight contributes to her health issues, noting that she has always been very heavy but prior to her alleged onset date, she was able to work with no weight-related problems.

She finished high school and took one year of college, but she had panic attacks and was unable to cope with the stresses of college. She last worked at a jewelry store during the Christmas season in 2003. Due to the stress and large numbers of patrons, she "ended up in the emergency room [her] last night of work with a panic attack." R. 584. Her

longest job was with Walmart, where she worked for three years. According to Sangel, she was fired for using the telephone without being punched out on a break. Sangel's husband owns a video store, and they live in an apartment in back of the business. She does not help out with the business because it requires too much standing and physical work.

Sangel described her physical symptoms as follows: "I have severe pain in my lower back and I . . . get muscle spasms. I have pain in both of my legs but my right leg is the primary leg with the most pain, the most consistent. Basically, every day. It's just, standing is, is a very big problem[.]" R. 571. She has had two surgeries on her back, and she has daily pain in her low back for which she has been seen at a pain clinic. She also has irritable bowel syndrome and stated she is "in the bathroom constantly" with diarrhea. R. 573-74. She has had her gall bladder removed, which she stated "made the problem much worse." R. 573. Sangel is an insulin-dependent diabetic, and she uses insulin four times a day. She also suffers from arthritis in several areas.

Sangel stated her physical problems "[a]bsolutely" would prevent her from working. She appeared at the ALJ hearing with a cane which she purchased about two years earlier, when her legs became painful, and it gives her "slight assistance" with walking. R. 491. Most days, just taking a shower tires her and causes her physical pain. She stated her "general everyday pain is an 8." R. 575. She experiences pressure, pain and spasms in her back, and her "leg throbs to the point where [she] would, if it were feasible to do bodily harm, because it hurts so much [sic]." *Id.* According to Sangel, her back surgeon imposed a permanent fifteen-pound lifting restriction on her, but no other doctor has placed any limitations on her.

She can stand for no more than fifteen minutes before she begins having muscle spasms in her leg. The pain "puts [her] out of [her] mind," and she spends a lot of her time in a recliner with her feet elevated. R. 576. She sees a family doctor for her pain

medication. When the ALJ noted that the last progress notes submitted were from March 2006, Sangel stated she takes Percocet for pain, and she sees the doctor every few months for medication checks. She stated she had taken 7.5 mg of Percocet and 500 mg of Tylenol twice daily for quite some time, but two days before the hearing, she was put on Oxycodone, 15 milligrams at a time, four times a day. It gives her good pain relief but she experiences several side effects, including double vision, dizziness, and extreme sleepiness. She also takes Neurontin "to alleviate the nerve pain in [her] legs." R. 577. She also has a prescription for muscle relaxers, but they give her "massive headaches," so she only uses them when absolutely necessary. *Id.*

With regard to her mental health, Sangel stated she has "severe depression," "panic attacks," "anxiety issues [and] agoraphobia." R. 578. When she is in a public place or around a lot of people, she "will have panic attacks and anxiety is overwhelming." *Id.* She does her grocery shopping late at night, when there are few shoppers, but even "the simple workers doing their job, throwing their freight, just the repetitive sound, [she] had a panic attack just because it was just sounds, and [she] had to leave." *Id.* She sat in the car while her husband finished the shopping.

Sangel attempted suicide in 1998, when she had problems in her previous marriage. She still has "lots of suicidal thoughts," and she hears "voices in [her] head and they tell [her] that suicide is a good thing." R. 579. She stated she has "to fight off those voices all the time, just so [she] can not focus so much on suicide." *Id.* She has suicidal thoughts "every day, all day," but she tries not to listen to "the bad voices." *Id.* She has frequent panic attacks, and stated she was "on the verge of a panic attack" during the hearing, but she was "trying to stay very calm." *Id.*

In June 2007, Sangel was seen at the Seasons Center after she had a "breakdown" in her home. She awoke in the morning and "started to have a full-blown panic attack."

R. 590. She called her doctor, who advised her to call 911. Paramedics responded and calmed her down, and she "had to be on oxygen for awhile." R. 590.

For her mental health issues, Sangel takes Xanax and Klonopin, which help her relax and sleep better, and Prozac, an antidepressant. The medications affect her ability to "stay focused on any one particular task for very long," and she is unable even to "sit and watch an entire television show." R. 580. On some days, she is very lethargic all day. She stated her panic attacks have worsened as she has gotten older, and they are triggered more easily than they used to be.

Sangel stated she loves to work and would like to be able to keep working. She feels guilty and worthless because she is unable to work, and feels that she is a burden on her family. She stated she cannot process even the mildest of stressors, and she has difficulty concentrating on much of anything. Physically, she can barely stand long enough to cook a simple meal, and her family members have to help out with household chores because she is unable to do them herself. She stated her pain is really a struggle for her and she is "heartbroken at the fact that [she] can't live a life like everybody else." R. 583.

Sangel's husband, Thomas Sangel, stated he and his wife have been married since September 4, 2004. He stated Sangel experiences anxiety "when she's around certain noises like children, TV commercials." R. 593. He stated they have to pause television commercials "because they can set her off, music in the car, if it's a certain repetitive sound." *Id.* On occasion, he has asked Sangel to help out in the video store for brief periods while he runs an errand, but he stated it "usually turns out bad." *Id.* Sangel will call him after a short time because dealing with the customers is agitating her, and Thomas will have to turn around and return to the store. R. 594. He stated the only household chore Sangel is able to handle regularly is the laundry. They eat a lot of TV dinners because Sangel "can't stand long enough to cook a real meal." *Id.*

At the time Sangel had her panic attack in June 2007, her husband awoke to her crying, breathing erratically, and shaking. They called 911 because her condition was more than he could handle on his own. R. 595.

Thomas also has observed his wife's difficulties from her irritable bowel syndrome. He stated that on many occasions, she will have trouble making it to the bathroom in time. R. 596-97.

Sangel's mother, Rose Ann Harris, stated Sangel has "suffered from depression and panic most of her life, and raising her wasn't easy[.]" R. 598. Sangel once had a panic attack when she was working at Walmart, and when Harris arrived at Sangel's apartment, Sangel was "in a corner . . . [and] couldn't breathe." R. 598. Harris stated she and Sangel used to enjoy doing things together, but they no longer can to go the mall or the fair or other places because of Sangel's fear of crowds. According to Harris, if anyone touches Sangel or bumps into her, "she just kind of has a meltdown. . . . She panics. She can't breathe. She . . . looks for an escape anywhere that she can be alone." *Id.* Harris said that over time, Sangel "has changed into an introvert where she . . . has bad dreams" and hears voices. R. 599.

Harris does not believe Sangel could work at any type of job. She stated Sangel tried a telemarketing job once but she was unable to do the job because even "the ringing of a phone . . . makes her crazy-acting" and "she just can't cope with it." *Id.*

The Vocational Expert indicated none of Sangel's acquired skills from her past work would transfer to less physical but semi-skilled occupations. The ALJ asked the VE to consider an individual of Sangel's age with her educational background and work history who "has diagnosed health problems causing the same work related limitations described in the testimony of the witnesses[.]" If the witnesses' testimony were given full weight and credibility, the VE stated the vocational effect would be as follows:

> A couple things stand out. Poor standing tolerance of
> 15 minutes, and the other problem is problems with mental

disorder and working around people. Almost all [her] jobs involved at least some degree of working around people and probably long-term standing, with the exception of the, the production line solderer. But anyways, she also needs to keep her feet elevated, spends time . . . in a recliner most of the day, has some side effects from her medication, has frequent diarrhea attacks, things like that. I don't see her as being able to return to her past work, nor do I see any other work that she's capable of doing. She tried a relatively sedentary job and it doesn't appear that she's capable of that either. So I don't see her being employable.

R. 602-03.

The ALJ then asked the VE to consider the same individual, but with limitations consistent with the state agency's assessment, as follows:

Assume the person who could occasionally lift or carry 20 pounds, frequently 10 pounds, could stand, walk, or sit, with normal breaks, about six hours of an eight hour day, in each capacity, push, pull is unlimited, postural activities are occasional with two exceptions. Balancing could be done frequently and climbing of ladders, ropes or scaffolds should . . . never be done. Assume further, no manipulative or visual or communicative limits. Environmentally, they would avoid concentrated exposures to respiratory irritants and to hazardous working conditions. Could such a person, in your expert opinion, perform any past work of . . . the claimant's?

R. 603. The VE responded, "The only job that fits the hypothetical is the production assembler," a light, unskilled job. *Id.* He indicated the solderer position would be exposed to fumes, and the store clerk would require "more than occasional postural kinds of things like stooping, bending[.]" R. 604. The VE stated there are other jobs the individual could perform, such as small products assembler, which is light duty, unskilled, and involves routine, repetitive-type work. *Id.* He stated the small products assembler could be performed even with a fifteen-pound lifting restriction.

## Summary of Medical Evidence

On September 14, 2000, Sangel was seen in the emergency room complaining of neck pain after being in a motor vehicle accident. She was diagnosed with a cervical strain and sprain, and was treated with Flexeril and Tylenol. She was told not to work the next day, and to follow up with her regular physician.

On September 28, 2000, Sangel saw Bruce A. Feldmann, M.D. with a complaint of dizziness, feeling "strange" and "a bit light headed at times." R. 274. Her symptoms had begun about five months earlier when she had been started on Paxil by another doctor "for anxiety[,] depression, social phobia - that type of symptoms." *Id.* She stated she suffered from depression, and a "phobia of crowds and people." *Id.* The doctor discontinued the Paxil and started her on Celexa. *Id.*

Sangel saw Dr. Feldmann on October 3, 2000, with a complaint of intermittent right upper quadrant pain with nausea, worse after meals. The doctor suspected gallbladder disease and ordered an ultrasound. R. 273. The ultrasound was "suboptimal," but it was "unremarkable for gallstones, bile duct dilatation, etc." R. 272. The doctor prescribed Prevacid, ordered further tests, and directed Sangel to return in two weeks. *Id.* On October 10th, Sangel called to say she was feeling much better on the Prevacid. The additional testing was canceled, and her Prevacid prescription was refilled. *Id.*

Sangel returned to see Dr. Feldmann on October 17, 2000, with an exacerbation of her asthma "with medication noncompliance." *Id.* She had not been using her inhaler regularly as prescribed. She received a nebulizer treatment in the clinic which improved her breathing. R. 271.

On November 2, 2000, Sangel and her boyfriend saw Dr. Feldmann for "preconceptual counseling" because they wanted to have a baby. Sangel's medication regimen included Depakote and Celexa, which were of concern. She was directed to "see

a neurologist about an opinion about a safer regimen that she [could] be on prior to initiating any kind of infertility evaluation." *Id.*

On March 15, 2001, Sangel was admitted into the hospital through the emergency room after she slipped on the ice, "fell right on her buttocks and complained of back pain." R. 374. She was diagnosed with an "[a]pparent small L-1 anterior/superior lip fracture stable." *Id.* The doctor ordered a lumbar corset to give Sangel "a little better lumbar tone to hopefully support the back a little better." *Id.* She was treated with Morphine initially. When she could ambulate, albeit with difficulty, she was switched to Naprosyn 500 mg twice daily, and Ultram 50 mg, one to two tablets every four to six hours. She was directed to return in 24 hours for fitting of the corset, and then to follow up with Dr. Feldmann in one week. R. 373.

On September 26, 2001, Steven Mayhew, Ph.D., performed a consultative psychological examination. R. 526-27. Although Sangel reported to Dr. Mayhew that she had "severe anxiety and depression" that was disabling, Dr. Mayhew noted that Sangel's "[r]ange of affective expression was somewhat narrow but overall unremarkable clinically." R. 526. Sangel also reported that "her mood improves most when she can be with family who live nearby." R. 527. Dr. Mayhew noted that Sangel's reported daily living activities included reading, writing, preparing meals, washing laundry, and shopping for groceries. Sangel also managed her own funds and was able to drive. *Id.* Dr. Mayhew further noted that Sangel's current seizure medication "has worked well." R. 526. Dr. Mayhew ultimately opined that Sangel was "capable of understanding and remembering simple instructions. She would appear capable of performing activities within a schedule. Her ability to maintain attention and concentration is considered good. She may have difficulty working in proximity to others without being distracted. Her ability to complete a normal workday with few interruptions from her psychiatric symptoms appears fair." R. 527.

On December 18, 2001, Beverly Westra, Ph.D., a state agency medical consultant, assessed Sangel's mental residual functional capacity ("RFC") and completed a psychiatric review technique form ("PRTF"). R. 459-76. Dr. Westra opined that Sangel's major depression did not meet or equal Listing 12.04. R. 462, 476. Rather, Sangel's depression only caused (1) mild restriction in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) mild difficulties in maintaining concentration, persistence, or pace; and (4) no episodes of decompensation of extended duration. R. 469. In assessing Sangel's mental RFC, Dr. Westra opined that she was moderately limited in her ability to interact with the general public and to respond appropriately to changes in the work setting, but was not otherwise significantly limited. R. 473-74.

On December 19, 2001, another state agency medical consultant, J.D. Wilson, M.D., assessed Sangel's physical RFC. R. 477-82. Dr. Wilson opined that Sangel had no exertional, manipulative, visual, communicative, or environmental limitations, other than having to avoid moderate exposure to hazards, such as machinery and heights, because of her previous history of seizures. R. 478-81. Dr. Wilson noted, however, that Sangel did not allege any disability related to her asthma and that she last sought treatment for asthma in June 2001. R. 479.

On January 5, 2002, Sangel was seen in the emergency room for an acute asthma exacerbation. Prednisone was prescribed, as well as an albuterol inhaler as needed, which seemed to be working. Sangel reportedly was "breathing pretty well. Coughing a little [but] much better than it was 5 days ago." R. 266. She was not smoking, but had been around her brother who smoked. She saw Dr. Feldmann for follow-up on January 9, 2002, and reported that the inhaler seemed to be working for her. In addition, she was tolerating Zoloft well and was ready to try a larger dosage of 50 mg. *Id.*

Sangel saw Jeffry R. Peterson, D.O. on January 28, 2002, complaining of low back pain which she rated at 8 to 9 on a ten-point scale. She stated the pain had begun shortly

after an accident on New Year's Eve when she backed into another car. Although the impact was low and she was not thrown around in the car, she began to suffer low back pain and discomfort the following day, and the pain had worsened since then. She was working at Hy-Vee, where she had to stand in one place on a hard floor to do dishes. She stated that after about three minutes of standing, her pain worsened.

On examination, the doctor noted Sangel had "marked lumbar paravertebral muscle spasm and tenderness both on the left and the right," with "no palpable pain or discomfort over the spine itself." R. 265. Straight leg raising elicited "hamstring pain at about 50 degrees bilaterally." *Id.* She had "fair" range of motion of the lumbar spine, and "some chronic decreased sensation of the right lower lateral leg." *Id.* X-rays were ordered, and Sangel was started on Flexeril and Naprosyn, with intermittent moist heat packs to her low back. He ordered her to stay off work for three days "with lying preferred, standing and walking recommended and no sitting." *Id.* He also recommended a physical therapy program, but Sangel declined due to lack of insurance. *Id.*

Sangel called Dr. Peterson on January 31, 2002, to report continued back pain. The x-rays of her lumbar spine had showed "slight worsening of a very mild compression[ ] of the superior end plates of T11 and L1," which was noted to correspond to "her discomfort on exam." R. 264. Sangel reported a history of falling on March 15, 2001, and x-rays from that time period showed the same mild superior end plate compressions, but they were less evident than in the new x-rays. The doctor advised her to "continue conservative activity. No prolonged sitting. The same medications and remain off work until Monday 2/4/02 and see if her symptoms are not improving by then." R. 264. If her symptoms continued, Dr. Peterson would have Sangel follow up with Dr. Feldmann.

Sangel called Dr. Peterson's office on February 4, 2002, still complaining of bilateral leg pain. She was referred to orthopedic specialist Philip A. Deffer, Jr., M.D. She saw Dr. Deffer on February 13, 2002, "for evaluation of back and bilateral leg

pain . . . going on since about a year ago." R. 290. Sangel stated she had pain "going down both of her legs down to her feet but not into her feet." *Id.* Her pain increased with coughing and sneezing. Sangel weighed 310 pounds at the time of this examination. She exhibited good motor strength of her lower extremities, and positive straight leg raise and cross-straight leg raise. Dr. Deffer diagnosed her with "[l]ow back pain with possible recurrent herniation." *Id.* He prescribed Vicodin for pain and ordered an MRI. He also directed her to stay off work. *Id.* Sangel saw Dr. Deffer on February 15, 2002, for follow-up, and he advised her that the MRI showed "apparent recurrent herniation at L-4/5 and bulging at 5/1." R. 289. The doctor planned to refer Sangel to an orthopedist at the University of Iowa for further evaluation.

On March 8, 2002, John Glaser, M.D., performed a consultative examination of Sangel regarding her complaints of low back pain. R. 534-37. Dr. Glaser recommended a rehabilitation program, rather than surgery, because "a good rehab program has a higher success rate than surgery." R. 537. Sangel, however, was "adamantly against rehab." *Id.*

On May 6, 2002, Sangel was seen in the emergency room with a complaint of sudden low back pain after attempting to lift a laundry basket from the back seat of her car. She was treated with Dilaudid and Valium, and was given a prescription for Vicodin for pain.

On May 11, 2002, another state agency consultant, Dee Wright, Ph.D., assessed Sangel's mental RFC and completed a PRTF. R. 483-500. Dr. Wright opined that Sangel's major depressive disorder and personality disorder did not meet or equal the criteria for Listings 12.04 and 12.08. R. 483-90. Rather, Sangel's condition only caused (1) mild restriction in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) no episodes of decompensation of extended duration. R. 493. In assessing

Sangel's mental RFC, Dr. Wright opined that she was moderately limited in her ability to (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) work in coordination with or proximity to others without being distracted by them; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact with the general public; and (6) respond appropriately to changes in the work setting. R. 497-97A. Sangel was not otherwise significantly limited. *Id.*

On May 17, 2002, Chrystalla Daly, D.O., a state agency consultant, assessed Sangel's physical RFC. R. 501-07. Dr. Daly opined that Sangel could lift and/or carry occasionally up to 20 pounds and frequently up to 10 pounds; sit, stand and/or walk for a total of about six hours each in an eight-hour workday; and push/pull without limitation. R. 502. Sangel could occasionally climb ramps and stairs (but never ladders, ropes, or scaffolds), balance, stoop, kneel, crouch, and crawl. R. 504. Further, she had no manipulative, visual, or communicative limitations. R. 504-05. Sangel was to avoid concentrated exposure to extreme cold, fumes and odors, and hazards such as heights because of her asthma and previous history of seizures. R. 505-06. Dr. Daly noted, however, that Sangel's seizure did not apparently impact her functioning and that "[t]here were no allegations of limitation of function due to asthma." R. 503.

Sangel was seen in the emergency room on October 29, 2002, with a complaint of recurrent back pain. On examination, she had spasms in her lower back. She was treated with Vicodin and Toradol.

Sangel saw Dr. Feldmann on March 11, 2003, who noted Sangel's diagnosis of diabetes. R. 403. Dr. Feldmann also noted that Sangel was uncooperative during the examination and refused lab tests for diabetes, even though the doctor informed her that she could obtain state assistance for the tests. *Id.*

On September 3, 2003, Sangel was seen in the emergency room with complaints of muscle spasms and pain in her left mid-thoracic area. She was treated with Vicodin and Flexeril.

Sangel saw Dr. Feldmann on November 13, 2003. She stated Prevacid was working well for her, but unfortunately was giving her headaches. She asked to try Protonix, and the doctor agreed to a trial of Protonix.

On April 13, 2004, Sangel saw Dr. Feldmann with a complaint of diarrhea, which she stated had been present for seven years. She had been taking Imodium regularly. The doctor opined Sangel likely had irritable bowel syndrome. He ordered lab tests and prescribed Questran. He recommended she "[s]trongly consider seeing [a] gastroenterologist as these problems have been 7 years, long-standing and are disruptive of her lifestyle." R. 397. She saw Dr. Feldmann for follow-up on May 10, 2004. She stated the Questran was "doing wonderful, making her bowels actually normal." *Id.*

Sangel returned to see Dr. Deffer on June 2, 2004, more than two years since she had last seen him. The doctor's notes indicate that the orthopedists at the University of Iowa had not felt Sangel was a surgical candidate back in 2002, and Sangel "was sent on her way." R. 288. Sangel stated she had "actually done pretty well for the last couple years but now [was] having recurrent pain in her back with pain down her left leg[, . . .] similar to what she had back in 1999 when she had a discectomy at 4/5." *Id.* Her pain primarily was in her left leg. The doctor ordered an MRI to evaluate her condition, and planned to set up an epidural steroid flood for symptomatic relief. He noted Sangel was "getting married in a few months and [was] concerned about being in pain for the wedding and subsequent honeymoon." *Id.*

The MRI showed the same herniation as the 2002 study, which Dr. Deffer noted had not changed significantly. R. 287. He administered epidural steroid blocks on July 6 and July 12, 2004, with little relief. Sangel was seen in the emergency room on

August 27, 2004, with a complaint of back pain, worsening over the past months, with no relief from Vicodin. On examination, the attending physician noted Sangel had muscle spasms with standing. She was treated with Toradol, and was given a prescription for Toradol.

She saw Dr. Deffer on September 2, 2004, complaining that her pain was worsening. The doctor noted he had "offered to send her to a neurosurgeon or an orthopedic spine surgeon in the past [but] she [had] always declined that." R. 286. However, she now was requesting a referral to be evaluated for possible treatments. Dr. Deffer planned to refer Sangel to Dr. Ralph Reeder. *Id.* In the interim, he increased her hydrocodone dosage.

Sangel saw Dr. Reeder on November 5, 2004, for evaluation of her low back pain and right-sided sciatica pain. A physician's assistant noted the following history of Sangel's condition:

> HISTORY OF PRESENT ILLNESS: Sara is a 27-year-old female who comes to the clinic today at the request of Dr. Deffer and is also a patient of Dr. Feldman's [sic]. She has a history of right-sided sciatica with a microsurgical discectomy at L4-5 in 1999 with good relief. In March of 2001, she slipped and fell on the ice, causing a return of her right-sided sciatica pain. Her current complaints include the right-sided sciatica pain as well as some back pain to a lesser degree since her fall in 2001. She states her pain has since plateaued and rates her leg pain at a 7 out of 10. She does have some pain in the left side to a lesser degree. She denies any numbness or tingling in her legs. She also denies any difficulty with bowel or bladder function. She has had some difficulty with ascending stairs but otherwise denies any weakness in her legs.
>
> Again, she currently rates her pain at an average of 7 out of 10 daily, but this does increase through the day, especially with standing, walking, sitting, and bending. Treatment so far has included two epidural floods, the last of which was in August,

and neither offered any relief for her. She has been using Vicodin and Flexeril for her medications, which offer some relief at night time. She has not had any oral prednisone. She did have some physical therapy prior to her first discectomy, and this was not beneficial for her.

MEDICAL HISTORY: She had a discectomy at L4-5 on the right side in 1999 with Dr. Chad Abernathy in Cedar Rapids. In 2001, she fell on the ice and states she had a "broken vertebra". Current and past medical conditions being treated include diabetes, anxiety, irritable bowel disease, history of seizures, prior back injuries, asthma, and female organ problems, including polycystic ovarian disease.

R. 316.

The P.A. noted Sangel exhibited "mild discomfort during the examination," exhibiting "some mild tenderness . . . over the lower lumbar spine"; "slightly decreased strength in the right lower extremity with dorsiflexion of the right foot and extension of the toes compared to her left"; but otherwise "good strength in the lower extremities with flexion and extension of the knees." R. 317. She had "pain to her right sciatic distribution with walking on her heels"; "slight difficulty with ascending a step with her right foot"; "good sensation to light touch and pinprick in the lower extremities"; and positive straight leg raising on the right "at approximately 45 degrees." *Id.*

Dr. Reeder noted his agreement with the P.A.'s history and physical findings. R. 318. On the doctor's own examination, he noted Sangel was 5'1" tall and weighed 280 pounds. She had "no palpable tenderness in the lower back," a normal motor exam, "good pulses in both lower extremities," absent reflexes in both ankles, and she was "able to walk on heels and toes and ascend[ ] a stair satisfactorily." *Id.* Dr. Reeder noted the following impression from his examination of Sangel:

The patient's symptoms are most consistent with sciatica due to problems from the disc herniation at L3-4. Her pain is now chronic. She is neurologically well. Her back pain is a significant problem for her. However, given her widespread

16

degenerative changes and the previous L4-5 problems, I would advise bilateral decompression by microsurgical discectomy rather than proceeding to a fusion operation at the L3-4 level. Would hope that by relieving her leg pain we can have the patient more involved in rehab so that she can avoid additional disc herniations and/or instability problems. The patient understands this rationale and wishes to proceed. . . . Given her obesity, I feel the patient is best managed as an inpatient with overnight observation.

*Id.*

Sangel underwent the bilateral microdiskectomy at L3-4 on November 19, 2004. "Large disk fragments" were removed from both the right and left side. The next day, notes indicate Sangel was making "good progress," and she felt her leg pain was improved. She was discharged in stable condition. Prior to her discharge, she saw Arturo Segismundo, M.D. for consultation regarding her diabetes. He recommended Sangel monitor her blood sugars twice daily, eat a proper diabetic diet, exercise, and lose weight.

Sangel saw Dr. Reeder for follow-up on December 14, 2004. She stated she had "no back or leg numbness, tingling, weakness, or pain following her surgery." R. 306. Sangel reported "doing very well, other than the fact that she 'walks crooked,' specifying that she feels she leans to the left when she is walking." *Id.* The doctor noted Sangel's gait was "normal, however, she does lean slightly to the left at the waist." *Id.* He noted a "slight footdrop on the left," as well. *Id.* The doctor noted the following impression from his examination:

Overall, Sara is very satisfied with the results of her surgery stating she has had 95% relief from her pain. We did recommend that she participate in some low impact aerobic exercises and also provided her with a copy of the "Back Book" for some exercises for her lower lumbar spine. She is possibly planning to begin working in the upcoming months at a factory that produces farm equipment. We recommended that she keep her lifting at a maximum of 10-15 pounds for the

> next couple of months and we will see her back in 2 months at
> Spencer Clinic and possibly advance this at that time.

R. 306.

On January 21, 2005, Dennis A. Weis, M.D., reviewed Sangel's medical records and completed a Physical RFC Assessment form. He opined Sangel would be able to lift/carry up to 20 pounds occasionally and 10 pounds frequently; sit for at least two hours and stand and walk for up to six hours each in an eight-hour workday; and push/pull without limitation. He opined she never should climb ramps or stairs, but she could perform all other postural activities occasionally. R. 296-303. He noted Sangel had a "positive response to recent surgical intervention regarding her back," and none of Sangel's treating sources had given any estimates regarding her RFC. R. 304.

On January 25, 2005, Sangel was seen in the emergency room after she had stretched and felt a "pop" in her neck. She reported pain in the left side of her neck and in her left arm. She had seen a chiropractor without relief. She was treated with Toradol, and was given prescriptions for Darvocet and Flexeril.

Sangel saw a physician's assistant in Dr. Reeder's office for follow-up on February 4, 2005. She reported occasional back discomfort, but no current complaints of pain, numbness, tingling, or weakness in her lower extremities. She reportedly was trying to do her back exercises, but she was not doing them regularly. The P.A. recommended Sangel "continue with her low impact aerobic exercises as well as stretching exercises[.]" R. 305. Dr. Reeder concurred with these recommendations. *Id.*

Sangel was seen in the emergency room on June 17, 2005, complaining of pain and muscle spasms in her lower right back. She was treated with Demerol, and was directed to "avoid bending, heavy lifting, prolonged sitting, and activities which make the problem worse." R. 333. Discharge instructions noted that a "back exercise rehabilitation program [could] be very helpful in reducing symptoms and preventing further episodes of pain." *Id.*

Sangel was seen in the emergency room on November 17, 2005, for her chronic back pain. She had run out of her pain medications two weeks earlier and was experiencing pain in her right lower back, radiating into her right buttock. She was treated with Torodal, and given two Percocet pills and 2 Flexeril pills, with instructions to follow up with her physician. R. 325.

On March 3, 2006, Sangel saw Sherry Kolacia-Tighe, M.D. for headache management. The doctor noted the following history:

> For a number of years she has had problems with holoacranial two parietal type headaches. I had seen her several days ago and prescribed some Midrin. Prior to that she had Imitrex but reacted with chest palpitations. Her headaches are occurring on a daily basis. She did take 3 Midrin yesterday and had some slight improvement but recurred and she took a Flexeril and a Percocet, which she takes normally for her back. She has done chiropractic care and this has not alleviated her symptoms. She is an insulin dependent type II diabetic but her blood sugars have been within normal range. It was 140 this morning. She also has known history of palpitations and is on Diltiazem for that. She describes the headache on the usual scale of 1-10 for her headaches as being about a 4 and occasionally as severe as an 8. States that this headache has been ongoing now for several weeks. It is not unusual in its character however and it seems to be worse at the end of the day. She has had no blurred vision. No coinciding upper respiratory symptoms.

R. 394. The doctor diagnosed Sangel with "Persistent tension headaches." *Id.* She prescribed a trial of Toradol and Amitriptyline.

Between June 22 and August 31, 2007, Sangel underwent mental health treatment at the Seasons Center for Community Mental Health. R. 538-42. On June 22, 2007, Sangel was diagnosed with generalized anxiety disorder, panic disorder with agoraphobia, but bipolar disorder was ruled out. R. 540. Prozac was prescribed. *Id.* On July 20, 2007, Sangel reported that her anxiety was well controlled and her mood was better. R.

19

539.  On August 31, 2007, Sangel reportedly was "doing really well," continued to "do well with the Prozac," and had her dosage increased to better control her anxiety.  R. 538. On October 26, 2007, Sangel reported that she felt "like she is doing really well with her energy and has a lot of projects that she has gotten started that she is looking forward to for the winter."  R. 550.

On November 14, 2007, Suzanne Bakken, C.N.P., performed a consultative examination of Sangel.  R. 543-49.  Ms. Bakken noted as follows:

> On initial questioning, the patient states that she has never had physical therapy.  She then states that she did have physical therapy prior to having her first surgery.  She reports it was no help.  The patient states at the initiation of our visit that she feels as though [physical therapy] will never help her, and that she is unwilling to go through it, as she feels it will only increase her pain.

R. 543.  Although initially on the new-patient questionnaire Sangel reported that she had never used illicit drugs or medication without a prescription, she reported on further questioning that she had smoked THC that summer.  R. 545.  Sangel further reported that "with adjustment of her [psychiatric] medication, she has been doing quite well, as far as her psychiatric issues go."  R. 544.  Ms. Bakken also noted that an MRI on January 31, 2007, revealed moderate foraminal stenosis on the right at L3-4 without evidence of nerve root impingement, and an MRI in February 2007 revealed no evidence of recurrent disc herniation.  R. 547.  Sangel last experienced a seizure in 2000.  R. 546.  Finally, Ms. Bakken told Sangel that she believed "at least part of [Sangel's] pain problem is fixable with physical therapy" and "that if she remained unmotivated and nonfunctional, that the Chronic Pain Clinic and opiate use was [sic] not appropriate for her."  R. 547.  Sangel ultimately was prescribed Oxycodone and "was cautioned [about] drowsiness."  R. 549.

## Summary of ALJ's Decision

The ALJ found that Sangel has not engaged in substantial gainful activity since her alleged onset date of March 15, 2001. He found her to have the following severe impairments:

> She is status post a discectomy at L4-L5 in 1999 and a microdiscectomy at L3-L4 on November 19, 2004, with MRI evidence of January 31, 2007, showing minimal changes suggestive of post-operative scarring at L4-L5 and along the posterior aspect of the thecal sac at L3. She experiences obesity, being 5 feet, 7 inches tall and weighing in excess of 300 pounds from 2000 to 2002; being between a high of 269 pounds in January 2005 to a low of 246 pounds in January 2006 and ending at 256 pounds in March 2006; and last weight 280 pounds when examined on November 14, 2007. The claimant testified she has had a weight problem her entire life and it does not case her physical problems. She has experienced symptoms of depression and anxiety with mixed personality traits, sometimes more pronounced than at other times over the time frame at issue in this decision, largely controlled with the use of Prozac and Xanax.

R. 28 (citations to exhibits omitted). However, the ALJ found that Sangel's impairments, singly or in combination, do not meet the Listing level of severity.

The ALJ found Sangel's testimony not to be fully credible, observing that she "has evidenced a tendency to assert various symptoms or medical problems have been present for long periods of time and quite debilitating although she did not seek treatment for said medical problems on more than an incidental or short-term basis." R. 30. He noted that some of Sangel's problems apparently were "resolved with treatment at the time or simply went away on their own," and he found that "[t]his tendency on the part of the claimant to exaggerate diminishes the credibility to be given her asserted symptomatology with resultant functional limitations as reported in record and at hearing." *Id.*

The ALJ found Sangel has the RFC "to perform light work involving only occasional postural activities and no climbing of ropes, scaffolds, or ladders." R. 29-30. In arriving at this RFC, the ALJ relied on the state agency consultants' conclusions "other than for limitations as to working in unclean air environments or around hazardous machinery," because the ALJ found Sangel's alleged limitations due to seizures and asthma "to be not medically documented or not severe." R. 30. He further stated:

> The claimant is also found capable of only performing non-complex, repetitive and routine work activities requiring no more than brief and superficial contacts with supervisors, co-workers, or the public as the result of her mental impairments during the time frame from March 15, 2001, forward. This mental residual functional capacity was less restrictive, at times, based on medical evidence and opinion in record as discussed below. Accordingly, the undersigned agrees with, and adopts, the conclusions of the state agency physicians regarding the claimant's mental residual functional capacity.

*Id*. The ALJ also found that "at all times the claimant would be found capable of performing the full range of work at the sedentary exertional level which would, in any case, preclude a finding of disability on a physical basis." R. 33.

The ALJ noted that Sangel performed her past relevant work as a production line solderer at the sedentary exertional level, although such work is generally performed at the light exertional level. R. 35, 124, 132, 217, 219, 262. Therefore, on the basis of the RFC the ALJ assigned to Sangel, he found that she "is capable of performing her past relevant work as a production line solderer, both as she performed it in late 1996 and 1997 and as generally performed in the national economy." R. 35. The ALJ, therefore, found that Sangel was not under a disability from March 15, 2001, through December 12, 2007, the date of his decision. R. 35-36.

*Disability Determinations and the Burden of Proof*

The Social Security Act defines a disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing,

pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page*, 484 F.3d at 1043 (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical

history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at step four, age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). "[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform." *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). "If the ALJ determines the claimant cannot resume her prior occupation, the burden shifts to the Commissioner at step five to show the claimant is capable of performing other work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards and whether the factual findings are supported by substantial evidence on the record as a whole. *Page*, 484 F.3d at 1042. This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010); *see Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that supports the Commissioner's decision as well as the evidence that detracts from it." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1997)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d

672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch*, 547 F.3d at 935). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43.

## Discussion

### A.    The ALJ's Credibility Determination

The ALJ found that Sangel's subjective complaints were not fully credible to the extent they exceeded the limitations in the ALJ's RFC assessment. R. 30. Sangel contends that the ALJ "did not give full weight and credit to [her] pain complaints . . . as they deserved." Doc. No. 12 at 9. According to Sangel, the ALJ's credibility finding "is purely conjectural and unsupported by any evidence in the record from any health care provider, physical or mental, to the effect that [she] exaggerates or magnifies her symptoms or is malingerer." *Id.* at 10. The Commissioner maintains, however, that the ALJ properly relied on inconsistencies in the record to discredit Sangel's subjective complaints. Doc. 13 at 17-21.

### 1. Legal Standard

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). Accordingly, the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). In this regard, an ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole. *Id.* When evaluating a claimant's subjective complaints, the ALJ must consider 1) the claimant's daily activities; 2) the duration, frequency and intensity of the pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii) (codifying *Polaski* factors). Other factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints. *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010). Thus, although an ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence, *Halverson v. Astrue*, 600 F.3d 922, 931-32 (8th Cir. 2010), such evidence is one factor that the ALJ may consider. *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008); *see Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010) (noting that an ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary). Further, an ALJ need not explicitly discuss each *Polaski* factor; it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints. *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009); *see Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth.").

## 2.    *Analysis*

In assessing Sangel's credibility, the ALJ first acknowledged the above factors.  R. 30-31 (citing 20 C.F.R. § 404.1529(c) and Social Security Ruling 96-7p).  The ALJ then pointed to inconsistencies in the record to discredit Sangel's subjective complaints, including her failure to seek treatment, her medical improvement with treatment, and the inconsistency between her allegations and the objective medical evidence.  R. 30-35.

Substantial evidence supports the ALJ's finding in this case.  The ALJ noted that, although Sangel's symptoms or medical problems allegedly had been present for long periods of time and were disabling, she did not seek treatment for those problems on more than an incidental or short-term basis.  R. 30.  The ALJ found that Sangel had only experienced low back pain for intermittent periods of time with even fewer reports of lower extremity pain.  R. 31.  The ALJ further found that, other than taking medications for the treatment of depression and anxiety between 2001 and 2007, Sangel did not seek further psychological treatment until June 2007, nor did she allege significant mental problems being present with the use of medication during the extended time frame between January 2002 and the early summer of 2007.  R. 35.

Conservative treatment of pain through over-the-counter medication and limited use of prescription medication can be inconsistent with a claimant's allegations of disabling pain.  *Moore v. Astrue*, 572 F.3d 520, 524-25 (8th Cir. 2009); *Clevenger v. Soc. Sec. Admin.*, 567 F.3d 971, 976 (8th Cir. 2009).  "A failure to follow a recommended course of treatment also weighs against a claimant's credibility."  *Guilliams*, 393 F.3d at 802.  Specifically, "[f]ailure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits."  *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995); *see* 20 C.F.R. §§ 404.1530(b), 416.930(b).  Good reasons justifying medical noncompliance may include a claimant's mental disorder, *Pate-Fires v. Astrue*, 564 F.3d 935, 945-47 (8th Cir. 2009), or lack of sufficient financial resources.  *Brown v.*

*Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004). Further, a claimant's failure to seek regular medical treatment is inconsistent with complaints of disabling pain. *Comstock v. Chater*, 91 F.3d 1143, 1147 (8th Cir. 1996). Accordingly, the ALJ articulated good reasons supported by substantial evidence to discount Sangel's credibility on the basis of her lack of regular medical treatment.

The ALJ further found that Sangel failed to follow recommended treatment. R. 32. In particular, the ALJ noted that Sangel "was adamantly against" following Dr. Glaser's recommendation to undergo a rehabilitation program. R. 32, 537. The record also indicates that Sangel refused to undergo recommended physical therapy that would help her condition. R. 33, 547. Accordingly, Sangel's failure to follow recommended treatment also weighs against her credibility. *See Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) (failure to follow recommended course of treatment weighs against claimant's credibility).

In addition, Sangel's medication controlled her anxiety and depression, and she continued to report doing well in 2007. R. 35, 538-42, 544, 550. Substantial evidence thus supports the ALJ's finding that the effective treatment of Sangel's depression and anxiety suggested that they were not disabling. *See Clevenger*, 567 F.3d at 976 (ALJ may reasonably discount claimant's subjective complaints of disabling pain when the pain is controllable by medication).

Finally, the ALJ noted inconsistencies in Sangel's testimony, including her testimony that she experienced dizziness and double vision as a side effect of her medication, when in fact Ms. Bakken had told her that the only possible side effect was drowsiness. R. 31, 549, 576, 591. As noted above, an ALJ may properly discount subjective complaints that are inconsistent with the record as a whole. *See Teague v. Astrue*, ___ F.3d ___, 2011 WL 1675421, at *3 (8th Cir. May 5, 2011) ("Given that none of [the claimant's] doctors reported functional or work related limitations due to her

headaches, there was a basis to question [the claimant's] credibility." (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004))); 20 C.F.R. §§ 404.1529(c), 416.929(c). In sum, Sangel's failure to seek and to follow treatment, her medical improvement with treatment, and the inconsistency between her allegations and the objective medical evidence were good reasons supported by substantial evidence in the record for the ALJ to discount Sangel's credibility.

## B. *Plaintiff's Residual Functional Capacity*

The ALJ found Sangel has the RFC "to perform light work involving only occasional postural activities and no climbing of ropes, scaffolds, or ladders." R. 29-30. The ALJ also found Sangel "capable of only performing noncomplex, repetitive and routine work activities requiring no more than brief and superficial contacts with supervisors, co-workers, or the public." R. 30. In determining Sangel's RFC, the ALJ adopted the "conclusions of the state agency physicians as to the claimant's physical residual functional capacity other than for limitations as to working in unclean air environments or around hazardous machinery," because those limitations were "attributable to seizures and asthma which [the ALJ] found . . . to be not medically documented or not severe." R. 30. Sangel maintains that the ALJ should have formulated a more restrictive RFC, namely, the physical RFC assessment of a state agency consultant in January 2005, in which the consultant opined that Sangel retained the RFC to stand and/or walk for at least two hours in an eight-hour workday. Doc. No. 12 at 13; R. 297. Sangel contends that she "clearly would not have been able to perform any of her past relevant work with an inability to stand for no more than two hours." Doc. No. 12 at 13. Sangel further asserts that the ALJ erred in finding that she performed her past work at the sedentary exertional level. *Id.*

Sangel's arguments are without merit. The RFC is a function-by-function assessment of an individual's ability to do work-related activities based upon all of the

relevant evidence. *Casey v. Astrue*, 503 F.3d 687, 696-97 (8th Cir. 2007); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (RFC is the most claimant can still do despite his or her limitations). Contrary to Sangel's assertion, the consultant completing the July 2005 physical RFC assessment did not find that Sangel was unable to stand for more than two hours. Rather, the consultant found that she could stand and/or walk for *at least* two hours in an eight-hour workday. In any event, according to Sangel, she stood and walked for ".10" of an hour and sat between 7 to 8 hours in an eight-hour workday as a production line solderer. R. 132. Sangel's assertion that she "would not have been able to perform any of her past relevant work with an inability to stand for no more than two hours" is thus unavailing.

Further, "[s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.* On forms Sangel completed as part of her application for benefits, she reported that she frequently lifted less than 10 pounds while working as a production line solderer. R. 35, 124, 132, 217, 219, 262. Substantial evidence, therefore, supports the ALJ's finding that Sangel actually performed her past work as a production line solderer at the sedentary level.

## C. Plaintiff's Ability to Perform Past Relevant Work

In determining Sangel's RFC, the ALJ adopted the state agency consultants' opinions except their opinions regarding Sangel's "limitations as to working in unclean air environments or around hazardous machinery," because the ALJ found these limitations based on seizures and asthma "to be not medically documented or not severe." R. 30. Sangel contends that the ALJ erred in finding that she has the RFC to perform her past relevant work as a production line solderer because the VE testified, in response to a hypothetical question by the ALJ, that environmental restrictions such as avoiding fumes and hazards would preclude such work.

"The regulations provide that the ALJ may elicit testimony from a vocational expert in evaluating a claimant's capacity to perform past relevant work." *Wagner v. Astrue*, 499 F.3d 842, 853 (8th Cir. 2007) (citing 20 C.F.R. § 404.1560(b)(2)). "In fashioning an appropriate hypothetical question for a vocational expert, the ALJ is required to include all the claimant's impairments supported by substantial evidence in the record as a whole." *Finch v. Astrue*, 547 F.3d 933, 937 (8th Cir. 2008) (quoting *Swope v. Barnhart*, 436 F.3d 1023, 1025 (8th Cir. 2006) (internal quotation marks omitted). An ALJ may omit alleged impairments from a hypothetical question posed to a vocational expert when there is no medical evidence that these conditions impose any restrictions on the claimant's functional capabilities. *Owen v. Astrue*, 551 F.3d 792, 801-02 (8th Cir. 2008).

Substantial evidence supports the ALJ's finding that Sangel's seizure disorder and asthma were either not medically documented or not severe. Sangel last experienced a seizure in 2000, and medication since then had controlled her seizure disorder. R. 502-03, 526, 541, 546. She last experienced an asthma attack in June 2001 and had not sought any treatment since then. R. 479. In *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001), the court found that the ALJ properly disregarded the portion of the vocational expert's testimony that was based on the claimant's incredible assertions. The ALJ in this case thus

properly excluded from his assessment of Sangel's RFC environmental limitations that were not supported by substantial evidence in the record. Accordingly, Plaintiff's argument in this regard is without merit.

## D.   *Listing 12.04*

Sangel finally maintains that she met or equaled the requirements for Listing 12.04. At step three, the claimant has the burden to show that her impairments meet or equal a listed impairment. *See Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004) (impairments must meet all specified listing criteria). Sangel provides no argument in this regard other than that her "work history, emergency care, and mental residual functional capacity assessments . . . demonstrate that she meets or exceeds the criteria under 12.04 B." Doc. No. 12 at 14. The court thus rejects Sangel's contention. *See Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) (summarily rejecting conclusory assertion that ALJ did not consider whether appellant met certain listings, where no analysis of law or facts was provided). In any event, as discussed below, substantial evidence supports the ALJ's finding that Sangel's impairment did not meet or equal the criteria of Listing 12.04.

The Commissioner's Listing of Impairments describes, for each of the body's major systems, impairments the Commissioner considers "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Listing 12.04 consists of "paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations)," as well as some "additional functional criteria (paragraph C criteria)." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00. The Commissioner describes the functions of the three types of criteria as follows:

> The criteria in paragraph A substantiate medically the
> presence of a particular mental disorder. . . .

The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The functional limitations in paragraphs B and C must be the result of the mental disorder described in the diagnostic description, that is manifested by the medical findings in paragraph A.

*Id.*, subs. (A), *Introduction*.

Paragraph B of Listing 12.04 requires that the disorder result in at least two of the following criteria:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

*Id.* § 12.04(B).[2]

In this case, the ALJ adopted the May 11, 2002, findings of the state agency consultant that Sangel's mental impairment only caused (1) mild restriction in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) no episodes of decompensation of extended duration. R. 30, 493. As noted above, the ALJ found that, other than taking medications for depression and anxiety between 2001 and 2007, Sangel did not seek further treatment until June 2007, and she did not allege significant mental problems between January 2002 and early summer 2007. R. 35. Sangel began treatment on Prozac in June 2007, and her mental status improved thereafter, with Sangel reportedly

---

[2] Listing 12.04 allows only the paragraph C criteria to be satisfied, as an alternative to satisfying both A and B. *Id.* § 12.04 ("The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied."). Because Sangel does not contend the ALJ should have considered her impairments under the paragraph C criteria of Listing 12.04, the court will omit discussion of those criteria here.

"doing well." R. 35. Substantial evidence thus supports the ALJ's finding that Sangel's mental impairment caused at most moderate limitations in functioning.

Despite Sangel's assertion that her mental impairment meets or equals Listing 12.04, it is not the court's function on judicial review to reweigh the evidence or to review the factual record *de novo*. *Baldwin*, 349 F.3d at 555. Rather, the court must affirm the Commissioner's decision if it is supported by substantial evidence in the record – *even if* the court would have weighed the evidence differently, or substantial evidence would support an opposite decision. *See, e.g.*, *Goff*, 421 F.3d at 789. In light of substantial evidence to support the ALJ's finding that Sangel did not have an impairment or combination of impairments that meets or equals any of the impairments in the Listing of Impairments, including Listing 12.04, Sangel's argument to the contrary is unavailing.

### Conclusion

For the reasons stated above, the court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, the Commissioner's decision is **affirmed**, and judgment will be entered in favor of the Commissioner and against Sangel.

**IT IS SO ORDERED.**

**DATED** this 23rd day of May, 2011.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT